IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| TIMOTHY P. SCHELL, | § | |
| | § | |
| Plaintiff, | § | |
| | § | Civil Action No. 3:17-CV-2907-D |
| VS. | § | |
| | § | |
| COMPANION DATA SERVICES, | § | |
| LLC, | § | |
| | § | |
| Defendant. | § | |

MEMORANDUM OPINION
AND ORDER

In this removed action by plaintiff Timothy P. Schell ("Schell") alleging claims under the Texas Commission on Human Rights Act ("TCHRA"), Tex. Labor Code Ann. § 21.001 *et seq.* (West 2015), for age and gender[1] discrimination, retaliation, and harassment and hostile work environment, defendant Companion Data Services, LLC ("CDS") moves for summary judgment. For the following reasons, the court grants CDS's motion and dismisses this action with prejudice by judgment filed today.

I

Schell was an employee of CDS—a computer programmer assigned to "Special Projects" during the day shift—when his employment was terminated on July 7, 2016.[2] CDS

_____

[1]Although the TCHRA refers to "sex" rather than "gender," because Schell alleges a "gender"-based claim and the parties in their briefing refer to "gender" discrimination, the court will do so as well.

[2]In deciding CDS's motion for summary judgment, the court views the evidence in the light most favorable to Schell as the summary judgment nonmovant and draws all

is a wholly-owned subsidiary of BlueCross BlueShield of South Carolina, a company that processes Medicare and commercial market claims. CDS hired Schell in 2007 as a contract programmer. He was promoted to the position of "Technical Team Lead" in 2008, and hired as a CDS employee in 2012. He worked as a team lead throughout his tenure with the company. In this non-management position, he was responsible for work assignments performed by his fellow team members. Schell was terminated on July 7, 2016, at age 62, after he reportedly made a profane comment to two members of management while under an indefinite written warning for violating company policies by failing to consistently communicate and treat others in a professional and respectful manner—a warning that itself followed a series of lesser written warnings and coaching regarding Schell's poor communication skills.

As early as February 2014, Schell was admonished in writing for his unprofessional communications with management and other employees. Schell's then supervisor, Sherri Smith ("Smith"), emailed Schell to ask why a certain job had been submitted twice. Schell responded, "The job was not submitted twice! It was restarted once! . . . What are you talking about 'The job submitted twice[?]' . . . The job was restarted because it abended, now does this clear things up for you?" D. App. 285. Smith replied that the "tone" of Schell's response seemed "quite severe and out of place," D. App. 285, and she requested

---

reasonable inferences in his favor. *See, e.g., Owens v. Mercedes-Benz USA, LLC*, 541 F.Supp.2d 869, 870 n.1 (N.D. Tex. 2008) (Fitzwater, C.J.) (citing *U.S. Bank Nat'l Ass'n v. Safeguard Ins. Co.*, 422 F.Supp.2d 698, 701 n.2 (N.D. Tex. 2006) (Fitzwater, J.)).

that they discuss it further when he arrived at work.

In April 2015 Schell completed a compliance training and quiz, part of which covered fraudulent billing practices. In the comment section of the quiz, Schell alleged that the fraudulent billing practices procedures did not apply to everyone because another employee, Ted Hendricks ("Hendricks"), did not work his assigned hours, and "furthermore never has!" D. App. 289. Carolyn Allison ("Allison"), CDS's compliance officer, emailed Schell and informed him that failure to work assigned hours was not a compliance issue, but was instead an issue for managers to handle individually with employees. She explained that she had spoken to management about the issue, and she reminded Schell that any course of action taken by management would not be reported to other employees. Schell replied to Allison's email, stating, "Carolyn, Thank you for your lecture, I'll keep this in mind next time I see something that needs to be reported." D. App. 287. In response, Allison met with Schell to coach him on his "[t]hank you for your lecture" comment.

Later in April 2015, Schell was accused of calling Hendricks names. Hendricks sent an email to Smith and another manager, Mark Bateman ("Bateman"), stating that he was "getting sick and tired of [Schell's] walking by [his] office and calling [him] names." D. App. 291. Hendricks demanded that Schell's behavior be stopped or he would pursue legal action. Smith and Bateman changed Hendricks's and Schell's shifts so that the two would no longer work at the same time. Schell recorded this incident in a record that he calls a "living document," where he chronicled managerial actions he perceived to be retaliatory. Schell wrote, "Hendricks claimed I called him a dickhead so my hours were changed[.]" P.

App. 127.

In July 2015 Schell received a performance review. According to the reviewer, he "met or exceeded expectations" in all categories except for "Communications," which evaluated, in part, an employee's ability to "Communicate[] in a courteous and professional manner." D. App. 296-298. In this category, he received a rating of "Needs Improvement." *Id.* at 298.

On February 18, 2016 Smith requested that team leads develop a process to ensure that clients received certain files. Schell responded by email the next day, stating, "Ok I know where this is going so I suggest that you dial in and verify them every night, I already have enough to do and I'm going to have even more to do in the near future!" P. App. 133. Schell stated that if others who were also allegedly responsible for the files did not think it "important enough to call" when there were failures, "Too bad!" *Id.*

Days later, on February 22, 2016, CDS issued an Employee Corrective Action Report in which it placed Shell on an indefinite written warning for violating the corporate code of conduct, including policy number 65205. An indefinite written warning is issued when the "same or similar offense should never happen again." D. App. 309. The policy states that employees are "to treat fellow employees and customers with consideration and dignity," D. App. 266, and that violations of the policy, including "[a]busive, harassing, demeaning, profane, obscene or threatening behavior or language will not be tolerated," *id.* at 267. The stated basis for the warning was:

> After receiving notification from a CDS customer that file
> NDM's had failed I instructed 4 team leads to work together to
> improve this process[.] After several email exchanges from this
> group Tim responded with an extremely unprofessional email to
> myself and the other team leads[.] This is not the first time
> Tim's email responses or tone of his communications with
> others have been unprofessional[.] Tim has been verbally
> counseled by his manager to cease this unprofessional behavior
> [.]

*Id.* at 309. The report identified the following required improvement:

> In accordance with policies 65003 and 65205 - Our Values/
> Personal Conduct, Tim has continued to violate the corporate
> code of conduct towards other employees. Tim fails to
> consistently communicate and treat others in a professional and
> respectful manner. This continued type of behavior will no
> longer be tolerated in the department[.] Tim Schell should
> follow all CDS guidelines addressing professional behavior. He
> should use professional language and responses whether verbal
> or written [.]

*Id.* The report stated that the "[f]ailure to sustain improvement may result in further

disciplinary action up to and including termination of employment. Management reserves

the right to escalate progressive discipline at any point in time." *Id.* This statement is

consistent with policy 65205, which warns that violations are "subject to disciplinary action

up to and including termination." *Id.* at 266.

On February 23, 2016, in response to the indefinite written warning, Schell submitted

a written rebuttal along with his "living document" of grievances to Colette Walker

("Walker"), the Human Resources Manager. In his email to Walker, Schell alleged that

"[Smith] has a problem with people who[] tell her the way it is instead of what she wants to

hear especially men[.]" P. App. 124. He stated that "[t]here is no telling how many men she

has done this to in her career.  One in particular was Frank Mata, he said what was on his mind also and then he was pushed and baited into finally saying something he could be fired for!" *Id*.  He also reported that Smith increased the night shift's work load instead of making another male employee do his job.

About one month later, on April 26, 2016, Schell allegedly said, "Whatever," to a superior during a conference call.  D. App. 224.  Schell's new supervisor, Liza Miller ("Miller"), emailed Schell and inquired about the response.  Schell replied, "If I said 'whatever' it was not to [the superior's] direction!  I must have been joking . . .  Is this the kind of thing you're worried about?  How about the fact that we actually made [our goals] because the [n]ight team and I did exactly what was needed[?]"  *Id*. at 319.  In response, Miller coached Schell to be more cautious on these calls in the future, and she documented the encounter as Schell's first offense in violation of the written warning.

Schell received another performance review on June 16, 2016.  This review stated that he met or exceeded all expectations except for "Leadership Leading Teams Developing the Team and Its Culture," "Communications," and "Working with Others."  *Id.* at 322, 324.  Schell received "Needs Improvement" ratings in these three areas.  *Id.*  On June 20, 2016 Schell was transferred from the night shift to the day shift because Miller allegedly needed Schell to do a specific programming job.  Prior to his transfer, Schell led one part of the night team, and a younger female, Olga Schiller ("Schiller"), led the other.  When Schell was transferred to the day shift, Schiller became the sole lead for the night team.  Although Schell's title remained the same, he no longer had employees reporting to him.  According

to Shell, he was demoted and replaced by the younger female who assumed his part of the night shift responsibilities. Schell complained to Miller that he had been demoted because of his age and gender.

On July 1, 2016 a manager-level employee, Ernie Ebersole ("Ebersole"), emailed Walker about an incident with Schell. Ebersole stated that, while he and Patrick Steele ("Steele"), a director, were walking past Schell's cubicle, Ebersole's sleeve got caught on a name plate on the cubicle wall. Ebersole reported that he and Steele laughed and joked about needing "[w]orkman's comp" for the incident. P. App. 120. As they were laughing, Ebersole heard Schell say, "'A**holes,' apparently in response to [Steele] & [Ebersole]." *Id.* Steele also emailed Walker and recounted similar facts. Steele stated that they "did not realize that Tim Schell was working days and as [they] walked by, [Schell] said, '[S]hut the XXXX up . . . A**holes." P. App. 121 (capital Xs and ellipsis in original). Miller asked Schell if he had made the alleged comments, and Schell, after asking who reported the comments, said he did not recall making them.

CDS terminated Schell's employment five days later for "continued violation of corporate policies #6205 and #65002." D. App. 331. In her deposition, CDS's corporate representative, Brenetta Richards ("Richards"), stated that Schell was fired for "inappropriate communications" and "violation[s] of our corporate policies, [which] he had a history of doing[.]" *Id.* at 222. She testified that there was no other reason for which Schell was fired. Richards explained that management appeared "to have taken a lot of time in coaching him . . . [but] Mr. Schell did not modify his behaviors." *Id.* at 254.

On the day that Schell was terminated, Miller went to gather Schell's belongings. Miller opened Schell's brief case and found a 45-caliber pistol inside. Schell had not given permission to Miller to open his brief case, and he alleges that he had forgotten that the gun was inside the brief case before walking into work.

Schell brings claims against CDS under the TCHRA for age and gender discrimination, retaliation, and harassment and hostile work environment. CDS asserts an "after-acquired evidence" defense based on the discovery of the 45-caliber pistol.[3] CDS moves for summary judgment,[4] and Schell opposes the motion.

## II

When a party moves for summary judgment on claims on which the opposing party will bear the burden of proof at trial, the moving party can meet its summary judgment obligation by pointing the court to the absence of admissible evidence to support the nonmovant's claims. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). Once the moving party does so, the nonmovant must go beyond his pleadings and designate specific

---

[3]Because the court grants CDS's motion, it does not reach the merits of CDS's alleged "after-acquired evidence" defense.

[4]In its motion, CDS maintains that, although Schell "suggested at his deposition that he was also claiming that he was discriminated against and harassed based on his race, . . . he [did] not assert a racial discrimination or harassment claim in either his [administrative] Charge of Discrimination or his Original Petition." D. Br. 15. In response to CDS's motion, Schell neither asserts that he can recover for race-based discrimination or harassment nor disputes that he is confined to the claims he has already pleaded in his original petition, which does not include any race-based claims. The court therefore concludes that Schell has not preserved on any race-based claims that the court need address in this decision.

facts showing there is a genuine issue for trial. *See id.* at 324; *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc) (per curiam). An issue is genuine if the evidence is such that a reasonable jury could return a verdict in the nonmovant's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The nonmovant's failure to produce proof as to any essential element of a claim renders all other facts immaterial. *See TruGreen Landcare, L.L.C. v. Scott*, 512 F.Supp.2d 613, 623 (N.D. Tex. 2007) (Fitzwater, J.). Summary judgment is mandatory if the nonmovant fails to meet this burden. *Little*, 37 F.3d at 1076; *Barnard v. L-3 Commc'ns Integrated Sys. L.P.*, 2017 WL 3726764, at *3 (N.D. Tex. Aug. 30, 2017) (Fitzwater, J.).

III

Before turning to Schell's individual claims, the court considers his failure to file a properly-compiled appendix and to cite the appendix in the manner required by Fed. R. Civ. P. 56(c)(1)(A) and this court's local summary judgment rules.

N.D. Tex. Civ. R. 56.6(a) provides that summary judgment materials must be included in an appendix. Rule 56.6(b)(3) requires that "[e]ach page of the appendix must be numbered legibly in the lower, right-hand corner. The first page must be numbered as '1,' and succeeding pages must be numbered sequentially through the last page of the entire appendix." Although Schell has filed a document entitled "Appendix in Support of Plaintiff's Response in Opposition to Defendant's Motion for Summary Judgment and Brief in Support," the document is essentially a set of cover pages that describe 12 separate exhibits filed contemporaneously. These exhibits are listed and described sequentially in the

cover pages, but they are not filed and numbered sequentially, as necessary to comply with the pagination requirement of Rule 56.6(b)(3). For example, ECF 27-2 is Exhibit 5, and ECF 27-3 is Exhibit 11.

If these were the only defects in Schell's response, the court would overlook them. While undesirable and somewhat burdensome, they do not ultimately interfere with the court's decisional process. But Schell has also failed to comply with Rule 56.5(c), which provides that "[w]hen citing materials in the record, as required by Fed. R. Civ. P. 56(c)(1)(A) or (B), a party must support each assertion by citing each relevant page of its own or the opposing party's appendix." Schell's response brief does not cite each relevant page of his appendix, except, perhaps, where the exhibit consists of only a single page. Instead, it cites generally to the exhibits that comprise the appendix, occasionally citing a deposition by its page and line numbers. *See, e.g.,* P. Br. 2-3.

These briefing defects *are* material to the court's summary judgment decision and will not be overlooked. Rule 56 "saddles the non-movant with the duty to 'designate' the specific facts in the record that create genuine issues precluding summary judgment, and does not impose upon the district court a duty to survey the entire record in search of evidence to support a non-movant's opposition." *Arrieta v. Yellow Transp., Inc.*, 2008 WL 5220569, at *2 n.3 (N.D. Tex. Dec. 12, 2008) (Fitzwater, C.J.) (quoting *Jones v. Sheehan, Young & Culp, P.C.*, 82 F.3d 1334, 1338 (5th Cir. 1996)), *aff'd sub nom.*, *Hernandez v. Yellow Transp., Inc.*, 670 F.3d 644 (5th Cir. 2012). "[T]he court is not obligated to comb the record in search of evidence that will permit a nonmovant to survive summary judgment." *Id.* (citing *Adams v.*

*Travelers Indem. Co. of Conn.*, 465 F.3d 156, 164 (5th Cir. 2006)). "Rule 56 does not impose upon the district court . . . a duty to sift through the record in search of evidence to support a party's opposition to summary judgment." *Evanston Ins. Co. v. Consol. Salvage, Inc.*, 2018 WL 5980496, at *2 (N.D. Tex. Nov. 14, 2018) (Fitzwater, J.) (alteration in original) (quoting *Willis v. Cleco Corp.*, 749 F.3d 314, 317 (5th Cir. 2014)). "The court is not obligated to consider evidence that the nonmovant fails to cite when opposing the summary judgment motion." *Id.* (citing Rule 56(c)(3) ("The court need consider only the cited materials, but it may consider other materials in the record.")).

Accordingly, the court holds that Schell has failed to raise a genuine issue of material fact in those instances where he has not adequately cited the summary judgment record.

## IV

The court turns first to Schell's claims for age and gender discrimination. Schell alleges that CDS terminated his employment based on his male gender and his age.[5]

## A

Under the TCHRA, "an employer commits an unlawful employment practice if because of race, color, disability, religion, sex, national origin, or age the employer fails or

---

[5]In his brief, Schell asserts that he was demoted. *See* P. Br. 4, 7, and 9. These assertions appear to be made, for example, to support his contention that he was replaced by a younger female (Schiller), or to serve as a predicate for his retaliation claim, but not as the basis for a stand-alone age or gender discrimination claim. *See, e.g., id*. at 7 (asserting in support of discrimination claim that "Defendant Had No Legitimate, Nondiscriminatory Reason for Firing Plaintiff," and 11 (asserting in support of retaliation claim that "Defendant Had No Legitimate, Non-Discriminatory Reason to Terminate Plaintiff's Employment" (bold font omitted)).

refuses to hire any individual, or discriminates in any other manner against an individual[.]" Tex. Labor Code Ann. § 21.051. Because Schell relies on circumstantial evidence to support his discrimination claims, they are properly analyzed under the familiar *McDonnell Douglas* burden-shifting framework. *See, e.g., Smith v. City of St. Martinville*, 575 Fed. Appx. 435, 438 (5th Cir. 2014) (per curiam).[6]

As modified, the *McDonnell Douglas* framework consists of three stages. First, Schell must establish a prima facie case of discrimination, which "creates a presumption that [CDS] unlawfully discriminated against [him]." *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 254 (1981). To establish a prima facie case of discrimination under the *McDonnell Douglas* framework, Schell must show that (1) he is a member of a protected class, (2) he was qualified for the position at issue, (3) he was the subject of an adverse employment action, and (4) he was replaced by someone outside the protected group or was treated less favorably than were other similarly situated employees who were not members of the protected class under nearly identical circumstances. *Hassen v. Ruston La. Hosp. Co.*, 932 F.3d 353, 356 (5th Cir. 2019), *as revised* (Aug. 1, 2019) (citing *Morris v. Town of Indep.*, 827 F.3d 396, 400 (5th Cir. 2016)).

Second, if Schell establishes a prima facie case, the burden shifts to CDS to articulate

---

[6]Texas courts construe the TCHRA consistently with federal law interpreting Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* For this reason the court analyzes Schell's claims under the Title VII evidentiary framework and related federal decisions. *See Shackelford v. Deloitte & Touche, LLP*, 190 F.3d 398, 403 n.2 (5th Cir. 1999) ("[T]he law governing claims under the TCHRA and Title VII is identical.").

a legitimate, nondiscriminatory reason for the employment action taken against him. *See St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506-07 (1993). CDS's burden is one of production, not proof, and involves no credibility assessments. *See, e.g., West v. Nabors Drilling USA, Inc.*, 330 F.3d 379, 385 (5th Cir. 2003).

Third, if CDS meets its production burden, Schell may prove intentional discrimination by proceeding under one of two alternatives: the pretext alternative or the mixed-motives alternative. *See Rachid v. Jack in the Box, Inc.*, 376 F.3d 305, 312 (5th Cir. 2004) (age discrimination case); *see also Benitez v. Heartland Hotel Corp.*, 2011 WL 13228411, at *3 (N.D. Tex. June 14, 2011) (Ferguson, J.) (sex discrimination case). Under the pretext alternative, Schell must "offer sufficient evidence to create a genuine issue of material fact . . . that [CDS's] reason is not true, but is instead a pretext for discrimination [.]" *Rachid*, 376 F.3d at 312 (citation and internal quotation marks omitted).[7]

"Although intermediate evidentiary burdens shift back and forth under this framework, '[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff.'" *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 143 (2000) (alteration in original) (quoting *Burdine,* 450 U.S. at 253).

The court will assume *arguendo* that Schell has established a prima facie case of age and gender discrimination. For this reason, the court will focus its analysis on the questions

---

[7]Schell does not rely in his response brief on the mixed-motives alternative.

whether CDS has produced a legitimate, nondiscriminatory reason for Schell's termination, and whether Schell has created a genuine issue of material fact as to intentional discrimination under the pretext alternative.

B

CDS contends that it had a legitimate, nondiscriminatory reason for terminating Schell because Schell told a director and a manager to "Shut the f**k up" after having been placed on an indefinite warning for unprofessional workplace communications and been repeatedly counseled and coached on his need to communicate professionally. CDS has produced evidence to support this reason. The use of profanity toward another employee in violation of company policies that expressly prohibit profanity, and after having received an indefinite warning for unprofessional workplace communications, is a legitimate, nondiscriminatory reason for terminating an employee. *See Adcock v. Sunquest Props., Inc.*, 421 Fed. Appx. 446, 449 (5th Cir. 2011) (per curiam) (holding that screaming inappropriate language, among other things, was a nondiscriminatory reason for termination); *see also Turner v. Claims Admin. Corp.*, 993 F. Supp. 982, 987 (W.D. Tex. 1998) (holding that reports of employee's use of inappropriate language was sufficient nondiscriminatory reason for termination).

Although Schell denies that he used this language and asserts that it "is a total invention by Defendant," P. Br. 7, this stage of the burden-shifting scheme does not involve credibility determinations. CDS's burden is one of production, not proof. *See, e.g., West*, 330 F.3d at 385. Because CDS has met its burden of producing evidence of a legitimate, nondiscriminatory reason for Schell's termination, "the burden shifts back to [Schell] to

make an ultimate showing of intentional discrimination." *Campbell v. Zayo Grp., LLC*, 2015 WL 3903539, at *3 (N.D. Tex. June 25, 2015) (Fitzwater, J.) (quoting *Reed v. Neopost USA, Inc.*, 701 F.3d 434, 439 (5th Cir. 2012)).

C

Schell must now show that the legitimate, nondiscriminatory reason proffered by CDS "[is] not its true reason[], but [was] a pretext for discrimination." *Reeves*, 530 U.S. at 143 (quoting *Burdine*, 450 U.S. at 253); *see also EEOC v. Chevron Phillips Chem. Co.*, 570 F.3d 606, 615 (5th Cir. 2009). At the summary judgment stage, of course, Schell is only obligated to raise a genuine issue of material fact regarding pretext. *See, e.g., Jackson v. Fed. Express Corp.*, 2006 WL 680471, at *6 (N.D. Tex. Mar. 14, 2006) (Fitzwater, J.) ("Because [defendant] has satisfied its burden to produce a legitimate, nondiscriminatory reason for [plaintiff's] discharge, in order for [plaintiff] to survive summary judgment, he must create a genuine and material fact issue regarding the ultimate question of discrimination.").

D

1

Schell addresses the issue of pretext in two parts of his response brief. When addressing the second step of the three-step burden-shifting paradigm—i.e., whether CDS had a legitimate, nondiscriminatory reason for firing him—Schell denies telling a director and a manager to "Shut the f**k up," and he posits that this claim "is a total invention by Defendant," P. Br. 7, that CDS took written statements from each director and manager and neither one claimed the language "specifically" quoted by CDS was used, and that in the

incident report, the statement was quoted as "Shut the hell up a\*\*holes."  Schell also

maintains that the only reason the incident is relevant is that it was alleged as a second

offense of "unprofessional behavior," but the first offense was based only on the expression

of the word "whatever" during a conference call, and it is questionable whether such an

alleged frivolous incident would have served as the basis for terminating a long term,

productive, older employee without confirming the pretextual nature of the entire process.

Schell also contends that CDS used the disruption of work incident as the basis for firing

him, but did not discipline the manager and director who mocked injured employees who file

for worker's compensation, which is conduct that CDS's Director of Human Resources and

corporate representative testified was "unacceptable"; that selective enforcement of policies

supports a claim of discrimination and is evidence of pretext, particularly terminating an

employee for violating a rarely enforced and often violated policy, and declining to terminate

other employees who committed infractions similar to the discharged employee's infraction;

and it is evidence of pretext that the unacceptable disruptive conduct of the mocking manager

and director precipitated the incident, but CDS fired Schell and did nothing to the manager

and director because they were carrying out the discriminatory purposes of CDS

management.  Finally, relying on *Burton v. Freescale Semiconductor*, 798 F.3d 222 (5th Cir.

2015), Schell posits that it is obvious from the substance and tone of the February 22, 2016

Employee Corrective Action Report that Schell's employment with CDS was then over, and,

under Fifth Circuit authority, when the termination decision has been made, all subsequent

actions by CDS, including the July 6, 2016 incident report and the pistol seizure are mere

pretexts, because, once an employer decides to fire an employee, the employee's subsequent job performance is not taken into account, and the fact that the employer takes such actions as subjecting the employee to a PIP, a RIF, or a defamation constitutes evidence of pretext.

In the portion of Schell's brief that explicitly addresses pretext, he essentially restates the foregoing grounds in the form of a list of evidence that he maintains shows that CDS's reliance the statements of the manager and director to fire him is pretextual:

> Plaintiff denies making the statement; The witnesses cannot agree on what the statement was; Defendant's Brief cites a statement that differs from the statements of the manager and director; Defendant's manager and director were engaging in unacceptable conduct at the time of the incident; The incident occurred right after Plaintiff's demotion to special projects; The incident did not cause harm to anyone but Plaintiff because he was fired; The manager and director admitted they precipitated the incident and disrupted Plaintiff's work; [and] Plaintiff had just received a very favorable performance evaluation when the incident occurred.

P. Br. 9-10 (bullet points omitted).

Schell's assertions of pretext can be grouped as follows: first, he did not make the statement on which CDS relies, as shown by the fact that CDS took written statements from each director and manager, and neither claimed the language "specifically" quoted by CDS was used, and that, in the incident report, the statement was quoted as "Shut the hell up a**holes"; second, the only reason the incident is relevant is that it was alleged as a second offense of "unprofessional behavior," but considering that the first offense was only the expression of the word "whatever" during a conference call, it is questionable whether such an alleged frivolous incident would have served as the basis for terminating a long term,

productive, older employee without confirming the pretextual nature of the entire process; third, CDS selectively enforced its policies, using the disruption of work incident as the basis for firing Schell, but not disciplining the manager and director who engaged in conduct that CDS's HR Director and company representative testified was "unacceptable"; and, fourth, as evidenced by the substance and tone of the February 22, 2016 Employee Corrective Action Report, Schell's employment with CDS was then over, so all subsequent actions by CDS, including the July 6, 2016 incident report and the pistol seizure, are mere pretexts.

2

The first ground on which Schell relies to establish pretext is that he did not make the offensive statement that CDS maintains prompted it to terminate his employment.

"[A] plaintiff must offer evidence to support an inference that the employer had a [discriminatory] motive, not just an incorrect belief." *Haverda v. Hays Cty.*, 723 F.3d 586, 596 n.1 (5th Cir. 2013) (addressing retaliation). Pretextual motives cannot be proved "merely by disputing the truth of the underlying facts for that reason [because] [s]uch evidence alone merely implies that an employer may have made a mistake in deciding to take action against an employee," which, of course, it is entitled to do. *Id.* (citing *Lemaire v. La. Dep't of Transp. & Dev.*, 480 F.3d 383, 387 (5th Cir. 2007)); *see also Keller v Coastal Bend Coll.*, 629 Fed. Appx. 596, 602 (5th Cir. 2015). A plaintiff's "self-serving statements that he did not commit [the underlying act] are insufficient to create a triable issue of fact[.]" *Jackson v. Cal-Western Packaging Corp.*, 602 F.3d 374, 379 (5th Cir. 2010). Although a plaintiff may "show that the [the employer's] explanation [for the employee's termination]

is so unreasonable that it must be pretextual," the plaintiff still "must point to evidence creating an issue of fact as to the pretextual nature of the explanation." *Sandstad v. CB Richard Ellis, Inc.*, 309 F.3d 893, 899 (5th Cir. 2002)  A mere dispute of the employer's "assessment of his performance will not create an issue of fact" because "the issue at the pretext stage is whether [the employer's] reason, even if incorrect, was the real reason for [the employee's] termination." *Id.* (citing *Evans v. City of Houston*, 246 F.3d 344, 355 (5th Cir. 2001)).  "In cases in which an employer discharges an employee based on the complaint of another employee, the issue is not the truth or falsity of the allegation, but 'whether the employer reasonably believed the employee's allegation and acted in good faith.'" *Jackson*, 602 F.3d at 379 (quoting *Waggoner v. City of Garland*, 987 F.2d 1160, 1165 (5th Cir. 1993)). Moreover, "[t]he existence of competing evidence about the objective correctness of a fact underlying a defendant's proffered explanation does not in itself make reasonable an inference that the defendant was not truly motivated by its proffered justification." *Little v. Republic Ref. Co.*, 924 F.2d 93, 97 (5th Cir. 1991) (citing *Bienkowski v. Am. Airlines, Inc.*, 851 F.2d 1503, 1507 (5th Cir. 1988)).

Here, Schell merely disputes the underlying facts.  He denies making the offensive statement, asserts that the witnesses cannot agree on what the precise statement was, and posits that CDS's brief cites a statement that differs from those of the manager and director. But he has produced no evidence that would give rise to an inference of discriminatory motive or any indication that CDS's stated reason was not the real reason for his termination. Schell has presented no evidence, aside from the minor variations in the reported statements

and his own dispute that he made the statement, that would render CDS's reliance on its employees's reports "unworthy of credence, absurd, or unwise." *Smith*, 575 Fed. Appx. at 442. Thus the variations in the reported statements and Schell's own denial, without more, are insufficient to raise a genuine fact issue as to discriminatory intent. *See Little*, 924 F.2d at 97. Without "evidence to suggest that [CDS] used this incident as cover for a motivation to terminate [Schell] for [his] age [or gender], no reasonable jury could infer pretext." *Moore v. Macy's Retail Holdings, Inc.*, 2019 WL 1979363, at *2 (N.D. Tex. May 3, 2019) (Godbey, J.). Because Schell has not "adduce[d] evidence supporting an inference that [CDS's] motive was age-based [or gender-based] animus" and has not otherwise offered evidence that CDS's stated reason was not the true reason for his termination, his evidence is insufficient to raise a material dispute of fact regarding his first ground for establishing pretext. *See Sandstad*, 309 F.3d at 899.

3

The second ground on which Schell relies to establish pretext is that his first offense of "unprofessional behavior" was based on his use of the word "whatever" during a conference call. He maintains that it is questionable whether such an alleged frivolous incident would have served as the basis for terminating an employee of his tenure, productivity, and age without confirming the pretextual nature of the entire process. But the summary judgment evidence would only permit a reasonable jury to find that the first offense rested on Schell's use of the words "Too Bad!" in an email written in response to Smith and others. D. App. 305. This resulted in his receiving an indefinite written warning on February

22, 2016 for communications deemed extremely unprofessional—conduct that had occurred before and that had recurred despite counseling from management. This ground for establishing pretext—which is premised on a mistaken fact—is insufficient to raise a genuine fact issue.

4

The third ground on which Schell relies to establish pretext is that CDS selectively enforced its policies, using the disruption of work incident as the basis for firing Schell, but not disciplining the manager and director who engaged in conduct that CDS's Human Resources Director and corporate representative testified was "unacceptable."

Although "differential treatment of similarly-situated employees can show pretext," the Fifth Circuit "require[s] that the contexts be 'nearly identical.'" *Khalfani v. Balfour Beatty Communities, L.L.C.*, 595 Fed. Appx. 363, 367 (5th Cir. 2014) (per curiam) (citing *Hernandez*, 670 F.3d at 659). Schell must demonstrate that "any of the employment actions 'were taken under nearly identical circumstances,' including that [Schell] and the other employees shared the same job or responsibilities, reported to the same supervisor, had 'essentially comparable violation histories,'" and "the conduct that drew the adverse employment decision [was] nearly identical." *Hernandez*, 670 F.3d at 659 (quoting *Lee v. Kan. City S. Ry. Co.*, 574 F. 3d 253, 260 (5th Cir. 2009)).

Schell has not set forth any facts that would support a finding that the contexts of the comparators—i.e., the manager and the director—are nearly identical to Schell's. At a minimum, Schell has provided no evidence regarding the comparators' violation histories.

This failure is critical in this case because CDS has introduced evidence that Schell had already been given an indefinite written warning for a violation of work rules, meaning that "[t]his same or similar offense should never happen again." D. App. 309. There is no proof that the manager and director were subject to a similar indefinite written warning. Because Schell has failed to raise a genuine fact issue that the comparators are similarly situated, his selective enforcement argument fails as a basis to establish pretext.

5

The fourth ground on which Schell relies to establish pretext is that all actions by CDS, including the July 6, 2016 incident report and the pistol seizure, are mere pretexts considering the substance and tone of the February 22, 2016 Employee Corrective Action Report. Schell cites *Burton* for the proposition that "post-[termination] decision incidents are irrelevant, as are pre-decision incidents unknown to the decisionmaker at the time of the decision." *Burton*, 798 F.3d at 232 (citing *Patrick v. Ridge*, 394 F.3d 311, 319 (5th Cir. 2004)).

Schell posits that CDS decided to terminate him on February 22, 2016, not on July 7, 2016. But Schell cites no authority for the proposition that an indefinite written warning constitutes proof of CDS's decision to terminate him, nor does he provide any other evidence that CDS intended to fire him as of February 22, 2016. Instead, Schell makes the conclusory, unsubstantiated assertion that the "substance and tone" of the indefinite written warning evidences a decision to terminate his employment. P. Br. 9. Such an unsupported allegation is not competent summary judgment evidence of pretext. *See, e.g., TIG Ins. Co. v. Sedgwick*

*James of Washington*, 276 F.3d 754, 759 (5th Cir. 2002) (citing *SEC v. Recile*, 10 F.3d 1093, 1097 (5th Cir. 1993) ("Conclusional allegations and denials, speculation, improbable inferences, unsubstantiated assertions, and legalistic argumentation do not adequately substitute for specific facts showing a genuine issue for trial.")).

Furthermore, Schell has failed to introduce any evidence that would explain why CDS waited over five months to terminate an employee whom it had allegedly decided to discharge in February 2016. *Cf., e.g., Burton*, 789 F.2d at 226 ("The delay between the decision and its implementation was attributable to the need to hire and retrain her replacement."). Because Schell has not presented any evidence or conflicting testimony that CDS decided to terminate his employment in February and then fabricated post-decision reasons for the discharge, the court concludes that Schell has not demonstrated a genuine dispute of material fact with regard to pretext on this basis.

## E

For the foregoing reasons, the court grants CDS's motion for summary judgment on Schell's age and gender discrimination claims.

## V

The court turns next to Schell's retaliation claim, which is based on his assertions that CDS retaliated against him for complaining to HR personnel that the Employee Corrective Action Report was a form of gender discrimination, and for complaining to Miller when he

was demoted from night shift lead to day shift special projects.[8]

A

Because Schell relies on circumstantial evidence to support his retaliation claim, he must proceed under the same *McDonnell Douglas* burden shifting framework. Schell must first demonstrate a prima facie case of retaliation by showing that (1) he engaged in a protected activity, (2) an adverse employment action occurred, and (3) a causal link existed between the protected activity and the adverse employment action. *See Walker v. Norris Cylinder Co.*, 2005 WL 2278080, at *9 (N.D. Tex. Sept. 19, 2005) (Fitzwater, J.) (citing *Long v. Eastfield Coll.*, 88 F.3d 300, 304 (5th Cir. 1996)). As to the third element, the requirement that a plaintiff show at the prima facie case stage a "causal link" between a protected activity and an adverse employment action is "much less stringent" than the "but for" causation that the trier of fact must find. *See Montemayor v. City of San Antonio*, 276 F.3d 687, 692 (5th Cir. 2001); *see also Khanna v. Park Place Motorcars of Hous., Ltd.*, 2000 WL 1801850, at *4 (N.D. Tex. Dec. 6, 2000) (Fitzwater, J.) (characterizing the prima facie case burden as "minimal").

If Schell establishes a prima facie case, the burden shifts to CDS to articulate a legitimate, non-retaliatory reason for the action taken. *See Walker*, 2005 WL 2278080, at *9. This burden is one of production, not of proof. *See Wooten v. Fed. Express Corp.*, 2007 WL

_____

[8]Portions of Schell's "living document" and his initial complaint refer to retaliation based on his report of Hendricks' alleged fraudulent billing practices. Schell does not rely on this ground in his response to CDS's motion for summary judgment, so the court need not consider it.

63609, at *16 (N.D. Tex. Jan. 9, 2007) (Fitzwater, J.), *aff'd*, 325 Fed. Appx. 297 (5th Cir. 2009).

If CDS meets its production burden, the burden shifts back to Schell to produce evidence that retaliation for his protected conduct, rather than CDS's proffered legitimate non-retaliatory reason, was the "but-for cause" of the adverse employment action. *See Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 352 (2013) ("Title VII retaliation claims require proof that the desire to retaliate was the but-for cause of the challenged employment action."); *see also, e.g., Coleman v. Jason Pharms.*, 540 Fed. Appx. 302, 304 (5th Cir. 2013) (per curiam) ("An employee establishes pretext by showing that the adverse action would not have occurred 'but for' the employer's retaliatory reason for the action." (citing *Nassar*, 570 U.S. at 352)). "In order to avoid summary judgment, the plaintiff must show 'a conflict in substantial evidence' on the question of whether the employer would not have taken the action 'but for' the protected activity." *Coleman*, 540 Fed. Appx. at 304 (quoting *Long*, 88 F.3d at 308).

### B

The court will assume *arguendo* that Schell has established a prima facie case of retaliation. Additionally, for the reasons explained above, the court holds that CDS has produced evidence of a legitimate, nondiscriminatory reason for terminating Schell's employment. Therefore, the court focuses its analysis on the causation prong of retaliation.

### C

To establish a fact issue concerning pretext, Schell relies on the same grounds that he

urges in support of his discrimination claims.  *See* P. Br. 11 ("The pretextual nature of the cursing management reasons for terminating Plaintiff is discussed *supra* and therefore will not be repeated here.").  The court therefore concludes, for the reasons already explained, that Schell has failed to raise a genuine issue of fact based on these four grounds.

Schell also relies on evidence that he was terminated 17 days after complaining to Miller about what he perceived to be a demotion from the night to the day shift.  *See id.* at 11 ("In addition, to the written charge of gender discrimination Plaintiff sent to HR in February 2016 Plaintiff also complained about discrimination to Liza Miller, his manager, when he was demoted from lead on the night shift to special projects on the day shift.  He was retaliated against by being fired only 17 days later." (citations omitted)).  CDS cites *McCoy v. City of Shreveport*, 492 F.3d 551 (5th Cir. 2007), for the premise that, although temporal proximity may assist in establishing causation, once the defendant offers a legitimate, non-retaliatory reason, more evidence than temporal proximity is required to prevail on a retaliation claim.  *See id.* at 562 (quoting *Swanson v. Gen. Servs. Admin.*, 110 F.3d 1180, 1188 (5th Cir. 1997)).  CDS contends that Schell has presented no such evidence.

The court concludes that Schell has not established a genuine issue of material fact with regard to but-for causation.  "Close timing between an employee's protected activity and an adverse action against him" may establish causation.  *Id.*  But "once the employer offers a legitimate, nondiscriminatory reason that explains both the adverse action and the timing, the plaintiff must offer some evidence from which the jury may infer that retaliation was the real motive."  *Id.*  In this case, both the adverse action and the timing are explained

- 26 -

by the fortuity of the nature of Schell's offensive comment and when he made it—i.e., on July 1, 2016. In other words, the severity and close timing of the adverse action that took place on July 7, 2016 are directly related to the fact that CDS believed that Schell made the highly offensive comment on July 1, 2016, within a matter of days after complaining to Miller about his perceived demotion. A reasonable jury could only find that the severity and close timing of the adverse action are the result of what Schell was believed to have said and when he said it.

The court concludes that Schell has failed to introduce sufficient evidence of pretext to present a genuine issue of material fact on the causation element of his retaliation claim. Therefore, the court grants CDS's motion for summary judgment dismissing this claim.

## VI

Finally, the court considers Schell's harassment and hostile work environment claims.

## A

A plaintiff may state an age-based hostile work environment claim under the TCHRA if he can show that "(1) he was over the age of 40; (2) the employee was subjected to harassment, either through words or actions, based on age; (3) the nature of the harassment was such that it created an objectively intimidating, hostile, or offensive work environment; and (4) there exists some basis for liability on the part of the employer." *Reed v. Neopost USA, Inc.*, 701 F.3d 434, 442-43 (5th Cir. 2012) (citing *Dediol v. Best Chevrolet, Inc.*, 655 F.3d 435, 441 (5th Cir. 2011)).

A gender-based hostile work environment claim must meet similar elements. The

plaintiff must show that (1) the employee belongs to a protected class; (2) he was subject to unwelcome harassment; (3) the harassment was based on his protected characteristic; and (4) the harassment affected a term, condition, or privilege of employment. *Lauderdale v. Tex. Dep't of Crim. Justice*, 512 F.3d 157, 162-63 (5th Cir. 2007). "To affect a term, condition, or privilege of employment, the harassment must be sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Paul v. Northrop Grumman Ship Sys.*, 309 Fed. Appx. 825, 828 (5th Cir. 2009) (quoting *Aryain v. Wal-Mart Stores Tex. LP*, 534 F.3d 473, 479 (5th Cir. 2008)). As with a hostile work environment claim predicated on age, the environment must be "deemed 'both objectively and subjectively offensive, one that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so.'" *Lauderdale*, 512 F.3d at 163 (quoting *Faragher v. City of Boca Raton*, 534 U.S. 775, 786 (1998)).

The factors to determine whether there was an objectively intimidating, hostile, or offensive work environment include: "(1) the frequency of the discriminatory conduct; (2) its severity; (3) whether it is physically threatening or humiliating, or merely an offensive utterance; and (4) whether it interferes with an employee's work performance." *Dediol*, 655 F.3d at 441 (quoting *EEOC v. WC&M Enters.*, 496 F.3d 393, 399 (5th Cir. 2007)). "Incidental or occasional age-based comments, discourtesy, rudeness, or isolated incidents (unless extremely serious) are not discriminatory changes in the terms and conditions of a worker's employment." *Reed*, 701 F.3d at 443 (quoting *City of Houston v. Fletcher*, 166 S.W.3d 479, 489 (Tex. App. 2005, pet. denied)).

B

CDS contends that Schell has not demonstrated that any of the alleged harassment Schell endured was related to his age or gender. *See Cherry v. CCA Props. of Am. Liab. Corp.*, 438 Fed. Appx. 348, 353-54 (5th Cir. 2011) (per curiam) (requiring plaintiff to prove that harassment was based on the protected characteristic). CDS also maintains that there is no evidence that any harassment affected his employment.

Schell supports his claim that he was subjected to harassment and a hostile work environment with his so-called "living document" that chronicles what he perceived to be retaliatory actions by management. The "living document" includes several incidents from 2013, well before he was reprimanded in writing for any of his communication challenges. These events include Schell's first report of Hendricks's alleged fraudulent billing to CDS Vice President Roger Arguello, long before Schell reported the practice to human resources, as well as Bateman's accusing Schell of threatening another manager. The document also includes Smith's changing Schell's team's hours, assigning his team additional reports to produce, and telling him that his team "can't do anything right." P. App. 125. Schell also asserts in the document that CDS could not "find any dirt" on Schell, so the company sent a male senior lead to "spy" on him and work nights as well. *Id.* Beginning in February 2014, the document chronicles the emails for which Schell was reprimanded and a request from human resources that Schell no longer wear cologne because another employee submitted a doctor's note that cologne made her sick.

Citing his declaration, Schell also posits that CDS "discriminatorily terminated its

productive male employees." P. Br. 12. He asserts that a female executive drove CDS into the ground and is responsible for the company's loss of contracts. He attributes this alleged loss of business to "get[ting] rid of as many key men as possible like Harold Rosee, Steve Barlow, Van Vong, Brian Jackson, Erin Baun, Terry White (whom they just hired back because they're desperate) and myself." P. Br. 12.

### C

Even if the court assumes *arguendo* that Schell has introduced evidence of harassment or a hostile work environment based on his age or gender, he has not introduced sufficient evidence for a reasonable jury to find that the harassment was sufficiently "severe or pervasive enough to create an objectively hostile or abusive work environment." *Cherry*, 438 Fed. Appx. at 354.

Regarding his age-based claim, Schell contends that "older men were harassed and methodically eliminated." P. Br. 3. He posits that CDS "discriminatorily terminated its productive male employees," *id.* at 12, and he lists six men who have departed from the company (one of whom has returned), but without pointing to any evidence of how they were similarly harassed, or the circumstances under which they left the company. The bare allegation that other older males were harassed is insufficient to create a fact issue regarding Schell's hostile work environment claim. *See Gibson v. Verizon Servs. Org., Inc.*, 498 Fed. Appx. 391, 394 (5th Cir. 2012) (per curiam) (holding that alleging that employer "had a history of bullying women" with "nothing to support this conclusory statement beyond her own belief, such as complaints made by other women or any evidence of [the company's]

treatment of other women" did not support inference that harassment occurred on the basis of gender).

And regarding his gender-based claim, Schell has neither provided evidence of nor argued that the harassment was sufficiently severe to satisfy the third element of a hostile work environment. *See Cherry*, 438 Fed. Appx. at 354 ("Cherry has not argued how the complained-of acts were 'severe or pervasive enough to create an objectively hostile or abusive work environment. . .' [t]hus, Cherry's hostile work environment claim was properly dismissed at summary judgment"). Schell merely alleges that the "living document is too voluminous" to be recounted in his brief, P. Br. 11, and he summarizes the document "as being a contemporaneous memorandum of the mental and emotional distress [he] endured" at CDS's hands, *id.*

The length of the document and Schell's suspicions that he was being watched and given more work than another male team lead of an unspecified age are not sufficient to support the severity and pervasiveness prong of his claim. *See Gonzales v. Wells Fargo Bank, Nat'l Ass'n*, 733 Fed. Appx. 795, 798 (5th Cir. 2018) (per curiam) (citing *Ellis v. Principi*, 246 Fed. Appx. 867, 871 (5th Cir. 2007)) (holding that assignment of more work and closer observation of an employee "amount to nothing more than 'careful monitoring of job performance,' which does not rise to the level of hostile work environment harassment."). Therefore, the court holds that Schell has not raised a genuine issue of material fact with regard to his harassment and hostile work environment claims, and it grants CDS's motion dismissing these claims.

* * *

For the reasons explained, the court grants CDS's motion for summary judgment and dismisses this action with prejudice by judgment filed today.

**SO ORDERED**.

September 19, 2019.

SIDNEY A. FITZWATER
SENIOR JUDGE